UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

K. JIN LIM as TRUSTEE OF MP LIQUIDATING
CO. LLC,

                    Plaintiff,                    Case Number 11-14422
                                                 Honorable David M. Lawson

v.

MILLER PARKING CO., JAMES N. MILLER
REVOCABLE TRUST UTA, NATHAN L. MILLER
TRUST, ALISON J. MILLER TRUST, DAVID M.
MILLER TRUST, and JAMES N. MILLER,

                    Defendants.
_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTIONS FOR SETOFF AND FOR PARTIAL SUMMARY JUDGMENT, AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S AND DEFENDANTS' MOTIONS TO STRIKE OR LIMIT EXPERT TESTIMONY

Plaintiff K. Jin Lim, the bankruptcy trustee of the estate of MP Liquidating Co. LLC,

formerly known as Miller Parking Company, LLC (Miller Detroit), has filed a turnover action based

on various theories against the current and former defendants.  She alleges that Miller Detroit

funneled many of its assets to a company in Illinois called Miller Parking Company (Miller

Chicago), that Miller Chicago is the *alter ego* of Miller Detroit, and that both companies made

fraudulent transfers to the detriment of the bankruptcy estate that should be set aside.  Lim settled

with the former defendants; the remaining defendants are Miller Chicago, James Miller, and Miller's

children's trusts.  Those defendants have filed a motion for setoff and a second motion styled in the

alternative as a motion *in limine* or for partial summary judgment, both intended to limit the

defendants' exposure to damages.  The parties also have filed motions to exclude or limit the

testimony of the other side's expert witnesses.  The Court heard oral argument on January 8, 2015.

The Court finds no merit in the defendants' motions seeking to limit damages and will deny them for reasons explained below. There is merit to each side's motions to preclude the other's expert witnesses from giving legal opinions, and therefore the Court will grant those motions in part.

<div align="center">I.</div>

The events giving rise to this case began in 2004, when Alan Ackerman and his company CH Holding sued Ackerman's business partner Bruce Miller and his company, Miller Detroit, in the Oakland County, Michigan circuit court, following a breakdown in the business relationship between the partners and their respective companies. Defendant James N. Miller (Bruce Miller's son) was then the president of Miller Detroit and a principal shareholder and officer of another Miller family business, Miller Chicago. In February 2009, while the Oakland County case was pending, a third party that held a long-term lease on Miller Chicago's major capital asset, the Bismark parking deck in Chicago, exercised an option in the lease to buy the deck. That left Miller Chicago with no ongoing operations or major assets other than cash from the sale. On June 30, 2009, Ackerman won a judgment in the Oakland County case against Miller Detroit for approximately $3,000,000. In September 2009, James Miller distributed $7,000,000 in cash held by Miller Chicago to its shareholders. Not long after, James Miller dissolved the Chicago company. On October 7, 2009, Miller Detroit filed for bankruptcy.

On October 7, 2011, Lim (the bankruptcy trustee for Miller Detroit) filed her complaint in this case against James Miller, Miller Chicago, and its former shareholders, which included Bruce Miller's children and grandchildren (Andrew Stein, Janet Stein, Matthew Stein, Amy M. Weinstein, Benjamin Weinstein, and Emily Weinstein). Lim alleged that James and Bruce Miller commingled

<div align="center">-2-</div>

the affairs of their two companies and carried out a fraudulent scheme to funnel assets from Miller Detroit to Miller Chicago, in order to evade creditor claims against Miller Detroit.

On January 11, 2013, after the Court granted Lim's motion to amend, Lim filed a nine-count amended complaint. In count I of her amended complaint, the trustee alleges that "[t]he payments by [Miller Detroit] to [Miller Chicago] made within the twelve (12) months prior to the bankruptcy filing date are voidable [under] 11 U.S.C. §547(b)." Am. Compl. ¶ 28. In counts II and III, she contends that "[t]he payments and other transfers made by Debtor to Defendants during the two years prior to the filing date of this case are voidable as fraudulent transfers [under] 11 U.S.C. § 548," *id.* ¶ 29, and "[t]he payments and other transfers made by Debtor to Defendants since the date when the claims of creditors Ackerman and CH Holding Company arose are voidable as fraudulent transfers. 11 U.S.C. § 544(b)(1), MCL § 566.34-36," *id.* ¶ 30. In count IV, the trustee alleges that "[t]he distributions by [Miller Chicago] to its defendant shareholders are voidable by Plaintiff to the extent of Plaintiff's claims against Defendant MPC." *Id.* ¶ 31. In counts V and VI the trustee seeks substantive consolidation of Miller Chicago and Miller Detroit and a judicial determination that Miller Detroit was the *alter ego* or a mere instrumentality of Miller Chicago for the purposes of the bankruptcy proceedings. In count VII, the trustee seeks damages for alleged breaches of fiduciary duty by defendant James N. Miller in his capacity as president of Miller Detroit. In count VIII, the trustee alleges a breach of contract on the premise that "[Miller Detroit] is entitled to compensation from [Miller Chicago] of not less than $4.6 million according to a spreadsheet provided by Defendant James N. Miller." *Id.* ¶ 50. Finally, in count IX, the trustee seeks an accounting of all transactions involving the Detroit and Chicago entities, alleging that the defendants have failed or refused to provide any accurate disclosure of the consideration received in exchange for certain

promissory notes issued by Miller Detroit to Miller Chicago or the various payments made under those notes and other arrangements between the companies.

In early 2013, several of the parties negotiated a triangular settlement to resolve all of the claims as to some of the common defendants in this matter and in the related case of *CH Holding v. Miller Parking*, 12-10629.  The parties to the settlement were the trustee, Ackerman, CH Holding, defendants Amy M. Weinstein, Emily Weinstein, Benjamin Weinstein, Matthew Stein, Andrew Stein, and Janet Stein (the children and grandchildren of Bruce Miller), and non-party Doris Miller (mother/grandmother of the Weinstein and Stein defendants).  The settlement was conditioned on (1) the execution of a settlement agreement between the *CH Holding* plaintiffs and the Weinstein and Stein defendants that would result in the dismissal of all claims against those defendants in *CH Holding*, 12-10629; (2) payment by the Weinstein and Stein defendants of $250,000 to the bankruptcy estate; and (3) Doris Miller conveying to the *CH Holding* plaintiffs her 10% interest in Center Parking Associates Limited Partnership, which derived income from certain parking facilities in Detroit.  The parties to the settlement stipulated for the purposes of their agreement that the Center Parking interest would be valued at $1 million.  The settlement agreement entered into between the trustee and the *CH Holding* plaintiffs provides in relevant part that:

> Doris Miller shall enter into an Irrevocable Assignment and Agreement pursuant to which she shall assign to [the *CH Holding* plaintiffs], jointly, her limited partnership interest (the "Interest") in Center Parking Associates Limited Partnership (the "Garage"), which Interest constitutes ten percent (10%) of the issued and outstanding limited partnership interests in the Garage, pursuant to the terms of the CH/Weinstein/Stein Settlement.
> . . .
> The Interest, for purposes of this agreement and allocation of payment only, shall be valued at $1 Million (the "Valuation").
> . . .
> CH shall indemnify the [bankruptcy] Estate up to the amount of any distribution on account of any allowed claims of the James N. Miller Revocable Trust u/t/a dated

-4-

11/19/1998 (the "Trust"), as if the Interest had been liquidated by the Trustee in the amount of the Valuation and such proceeds had been distributed to unsecured creditors of the Estate. For purposes of such indemnification, the maximum amount of claims of the Trust shall be $2,145,648.69. In the event the claim of the Trust is allowed, CH shall forthwith remit to the Estate the total indemnity amount owed pursuant to this Agreement.

. . .

The Trustee will be entitled to a commission based on the Valuation as if [the] Interest had been liquidated as part of the Estate.

The Trustee may make an interim distribution (the "Interim Distribution") on account of Interim Distribution Claims (as defined herein) against the Estate based on the Valuation as if the Interest had been liquidated as part of the Estate.

Plf.'s Resp. [dkt. #126], Ex. A, Settlement Agreement & Mutual Release (re Trustee, Ackerman, and CH Holding) at 2 (Pg ID 1401). As a condition of the settlement, the *CH Holding* plaintiffs released the Trustee from "any and all post-petition liabilities, claims, causes of action, debts, alleged unpaid amounts, obligations, costs, or damages," with the express exception of "any Proofs of Claim (or any claim(s) against the Estate asserted therein) filed or to be filed or amended by CH in the [Miller Detroit] bankruptcy." *Id.* at 4 (Pg ID 1403).

Under the terms of a separate, interlocking agreement, the trustee released the Weinstein and Stein defendants as well as Doris Miller from all past, present, or future claims that the trustee might have. In particular, the agreement stated that "[t]he Trustee expressly releases, acquits and discharges any and all claims that she could have [against Doris Miller] on behalf of any creditor in the [Miller Detroit] bankruptcy case." Plf.'s Resp. [dkt. #126], Ex. A, Settlement Agreement & Mutual Release (re Trustee, Weinstein Defs., and Stein Defs.) at 2-3 (Pg ID 1446-47). The *CH Holding* plaintiffs likewise executed a release of any and all claims they might have against either the Weinstein and Stein defendants or Doris Miller individually.

-5-

The bankruptcy court approved the settlement on October 22, 2013. Defendant James N. Miller and the various Miller family trust defendants appealed the approval decision to this Court, and the Court affirmed the bankruptcy court's order approving the settlement on May 14, 2014. Subsequently, on August 28, 2014, the Court entered a stipulated order dismissing all claims against the Weinstein and Stein defendants. The defendants that now remain are Miller Chicago, James N. Miller, and the various Miller family trusts for which James Miller acted as trustee.

Under the Court's scheduling order, discovery closed on October 20, 2014, and the deadline for dispositive motions and motions challenging experts was November 3, 2014. The parties filed their respective motions on that date. The jury trial will begin on February 10, 2015.

### A. Defendants' motion for setoff

The Miller defendants argue that because the trustee asserted all of her claims in the complaint against the defendants generally, and because she then settled with some of the defendants to resolve the claims against those individuals only, the settlement proceeds received by the bankruptcy estate or the estate's creditors (i.e., CH Holding), necessarily must represent satisfaction in part of the same or related claims as those that remain pending against the Miller defendants. The Miller defendants do not elaborate on this argument in either their motion or reply, but contend only that "it is . . . axiomatic that the Miller defendants are entitled to a setoff for any amounts previously paid to the Trustee to avoid a double recovery." The Miller defendants further ask that they be allowed to present evidence to establish the actual valuation of the interest in Center Parking conveyed by Doris Miller, which they contend was at least double the nominal amount of $1 million stipulated by the parties to the partial settlement.

-6-

The plaintiff has taken an aggressive stance in response, arguing that not only have the defendants failed to advance any factual basis in their motion to show how the claims involved in the settlement agreement and those against the Miller defendants are in fact common, but also asserting that the defendants cannot question the value of Dorris Miller's contribution to the settlement. On the second point, the plaintiff contends that the defendants are barred by the doctrine of *res judicata* from challenging the $1 million stipulated valuation assigned to the Center Parking interest, because the bankruptcy court approved the settlement agreement in its entirety, including the valuation of that interest, and the Miller defendants already litigated (and lost) their challenge to the valuation in their opposition to the trustee's motion to compromise (and in their appeal to this Court).

1.

The thrust of the defendants' argument is that Miller Detroit's creditors are not entitled to recover more than they are owed. "The basic legal principle that governs is that a plaintiff should be made whole for his injuries, but should not receive a windfall." *In re Foote Mem'l Hosp./Patient Care Info. Sys. Litig.*, 25 F.3d 406, 410 (6th Cir. 1994). This "'one satisfaction rule' . . . provides that a nonsettling defendant is entitled to an offset in the amount of the settlement between a settling defendant and the plaintiff." *Ibid.* (citing *United States Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1236 (10th Cir. 1988)).

However, "[a] limitation upon the application of this rule . . . is that the nonsettling defendant is only entitled to the offset if the judgment and the settlement relate to common damages." *Ibid.* "[W]hen the conduct of multiple defendants results in a single injury with common damages, and one of the defendants settles with the plaintiff, the amount of the settlement is credited against the

-7-

amount that may be recovered from the non-settling defendants." *Friedland v. TIC-The Indus. Co.*, 566 F.3d 1203, 1209 (10th Cir. 2009). "[T]his equitable doctrine operates to reduce a plaintiff's recovery from the nonsettling defendant to prevent the plaintiff from recovering twice from the same assessment of liability." *Chisholm v. UHP Projects, Inc.*, 205 F.3d 731, 737 (4th Cir. 2000). However, "[t]he essential requirement for the 'one satisfaction rule' is that the amounts recovered by settlement and the judgment must represent common damages arising from a single, indivisible harm." *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 501 (4th Cir. 2007) (quotation marks omitted).

The Miller defendants have not established that they are entitled to a setoff under the "one satisfaction rule." Although it seems possible that they could do so at some point, the defendants have not provided any factual basis on the record now before the Court to show that the amounts paid by the Weinstein and Stein defendants were in compensation for "common damages arising from a single, indivisible harm." *Ibid.*

Contrary to the defendants' position, the trustee did not allege all counts of the complaint generally against all of the defendants, but instead sought judgment against varied and specific parties in each count. As to count I (avoidance of preference), the trustee seeks judgment against defendant Miller Chicago only. In counts II and III (fraudulent transfer), the trustee seeks to recover payments allegedly made to all defendants. In count IV (disgorgement), the trustee seeks to recover from the "MPC shareholders" only (the Miller family trusts and the Weinstein and Stein individual defendants, *see* Am. Compl. ¶ 5). In counts V and VI (substantive consolidation and alter ego), the trustee seeks declaratory relief against Miller Chicago only. In count VII (breach of fiduciary duty), the trustee seeks to recover damages solely from James N. Miller individually. Finally, in count VIII

-8-

(breach of contract), the trustee seeks to recover damages from both Miller Chicago and its shareholders.  Count IX seeks only equitable relief in the form of an accounting, from Miller Chicago alone.  The Miller defendants have not established that any payments made by or on behalf of the settling defendants necessarily encompassed damages common to a single injury caused by all of the parties jointly, because under the applicable settlement and release agreement, the trustee agreed to release her claims against the Weinstein and Stein defendants only, which implicate at most counts II, III, IV, and VIII of the complaint.  The settlement did not implicate any claims for avoidance of preference on payments that the trustee seeks to recover from Miller Chicago alone, or for breach of fiduciary duty, for which the trustee seeks judgment solely against James Miller.

Moreover, it is evident from the nature of the claims that they do not involve any "single, indivisible harm."  The damages alleged here are inherently divisible, because they involve numerous payments, transfers, and transactions carried out over a span of years, involving the allegedly improper distribution of millions of dollars to a dozen named defendants and to third parties such as Bruce Miller.  Even as to those counts alleged against the defendants generally, the settlement proceeds could have been (and almost certainly were) intended by the parties to restore to the bankruptcy estate the payments made to or ultimately received by the settling defendants only. It would be strange indeed if the settling defendants intended by entering into the settlement to disgorge monies improperly distributed to the non-settling shareholders of Miller Chicago (principally James Miller and the Miller family trusts), or to restore funds allegedly distributed through myriad other specific transactions directly to James Miller, his trusts, or other third parties such as Bruce Miller.  The settlement agreement expresses no such intent, and the release language

implicating claims against the settling defendants only (expressly excepting claims against the non-settling defendants) cannot reasonably be read to suggest as much.

Nevertheless, although they have not yet produced an adequate factual basis to support a setoff, the Miller defendants may be able to sustain such a claim if they can establish that any part of the $1,250,000 settlement proceeds putatively "distributed" through the bankruptcy estate represents a recovery of, for example, specific assets of the debtor transferred through an avoidable or fraudulent transaction to Miller Chicago. And the Miller defendants — including James Miller, a former principal shareholder and officer of both entities — ought to be in as good a position as anyone to undertake the exercise of tracing funds transferred through the companies and ultimately paid out to the various shareholders.

2.

The Miller defendants also are not foreclosed from challenging the valuation of Doris Miller's contribution to the settlement. Collateral estoppel is inapplicable principally because there has been no final judgment entered in any proceeding that would implicate the value of the Center Parking interest, and also because the question of the actual valuation of that interest never was litigated by the parties or determined by either the bankruptcy court or this Court.

"Issue preclusion, often referred to as collateral estoppel, 'precludes relitigation of issues of fact or law actually litigated and decided in a prior action between the same parties and necessary to the judgment, even if decided as part of a different claim or cause of action.'" *Georgia-Pac. Consumer Products LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir. 2012) (quoting *Gargallo v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 918 F.2d 658, 661 (6th Cir. 1990)). "Four requirements must be met before issue preclusion applies: (1) the precise issue must have been

-10-

raised and actually litigated in the prior proceedings; (2) the determination of the issue must have been necessary to the outcome of the prior proceedings; (3) the prior proceedings must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding." *Ibid.* (citing *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 589-90 (6th Cir. 2009)).

The settlement agreement plainly states that "[t]he Interest, *for purposes of this agreement and allocation of payment only*, shall be valued at $1 Million (the "Valuation"). The bankruptcy court's approval of the settlement therefore cannot be construed as endorsing any valuation of the interest for any purpose other than determining the facial reasonableness of the settlement proposal as between the involved parties themselves.

Further, in making its determination to approve the settlement, the bankruptcy court found only that the stipulated value of the interest (approved by the estate's largest creditor), represented a "significant recovery" on the claims against the estate. The bankruptcy court was not called upon to determine the actual value of the interest, but only to decide whether the terms of the settlement between the interested parties were fair and equitable and in the best interests of the estate. *See In re Miller Parking Co., LLC*, 510 B.R. 123, 128 (E.D. Mich. 2014)

Finally, in deciding the Miller defendants' appeal, this Court made no factual finding as to the value of the Center Parking interest, but only determined that the Miller defendants had failed to present any evidence to support their alternative valuation:

> The appellant . . . argues that the Center Parking interest is worth 'double the $1,000,000 estimate of the Trustee.' But the appellant offers no evidence for its proposed valuation, and it points to nothing in the record that substantiates its belief. Indeed, as the Trustee pointed out in her reply brief in support of her motion to authorize the settlement, on January 30, 2013, James Miller made a written offer to Basil Simon, trustee of the Bruce Miller bankruptcy estate, to purchase a 15%

> interest in Center Parking for $450,000 — an offer that implies a proportional value
> of only $300,000 for the 10% interest now at issue.  Appellant's Mot. to Stay, Ex.
> 6, Email dated Jan. 30, 2013 (Pg ID 340).

*Id.* at 129.  This Court's decision on appeal was limited to the finding that "[t]he appellant has not

demonstrated any clear error of fact or law in the bankruptcy court's finding that the settlement was

fair and equitable.  Nor has the appellant shown an abuse of discretion."  *Ibid.*  Because the issue of

the valuation of the Center Parking interest never was litigated by the parties or determined by any

Court, the defendants are not precluded from disputing its value now, in the first instance.

The defendants' motion for a setoff will be denied.

### B.  Defendants' motion *in limine* or for partial summary judgment

Further seeking to limit their damage exposure, the defendants contend that the Court should

enter judgment as a matter of law in their favor "preventing any claims from being brought before

this Court by the Plaintiff as to two of the three parts of the Judgment that arose against Bruce Miller

from the [2004] Oakland County Circuit Court suit."  CH Holding is the largest creditor of the

Miller Detroit bankruptcy estate, mainly because of its state court judgment.  The Miller defendants

explain that the judgment entered on counts I and II of the complaint in the Oakland County case

was against Bruce Miller individually.  Therefore, they reason, the trustee should be barred from

attempting to collect on claims relating to any part of the judgment except as to count III, in which

Ackerman and CH Holding were awarded damages against Miller Detroit.

The trustee responds that the defendants' motion is nonsensical because the complaint in this

case asserts no claims based upon the judgment rendered in the Oakland County litigation and does

not seek to enforce any judgment.  Rather, the trustee seeks in her complaint to enforce the right of

the debtor's unsecured creditors to avoidance and preference as to certain pre-petition transfers, to

void allegedly fraudulent transfers and payments to the various defendants, to secure declaratory rulings as to the claims for substantive consolidation and alter ego, to recover damages for alleged breaches of fiduciary duty by James Miller, to recover damages for breach of contract from Miller Chicago and its shareholders, and to obtain equitable relief in the form of an accounting of all financial transactions involving the defendants.  She maintains that under 11 U.S.C. § 550, the trustee is allowed to recover all of the property involved in an avoidable or fraudulent transfer, without regard to the amount of the claims of the unsecured creditors whose rights she is pursuing.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required only when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The parties have not contested the basic facts relating to the Oakland County judgment or the status of those creditors.  Where the material facts are mostly settled, and the question before the court is purely a legal one, the summary judgment procedure is well suited for resolution of the issue. *See Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 435 (6th Cir. 2009).

The Court agrees with the plaintiff that the defendants' argument fails to apprehend the nature of the present action.  The Bankruptcy Code provides several avenues down which a trustee may proceed to recover property that a debtor improperly transferred to individual creditors or third parties in order to thwart the claims of creditors.

First, the trustee may assert a right of avoidance or preference to recover property transferred to any individual creditor shortly before the filing of a bankruptcy petition.  "When a debtor transfers

property to a creditor shortly before filing for bankruptcy, the effect is to increase the creditor's share of the estate.  Thus, under the bankruptcy statute, if a debtor transfers property to a creditor within a certain period (90 days for most creditors, 1 year for 'insiders') before the date of the bankruptcy petition, the trustee of the estate can void the transfer."  *Waldman v. Stone*, 698 F.3d 910, 919 (6th Cir. 2012) (citing  11 U.S.C. § 547).

Second, where the debtor transfers property to any third party in an attempt to put its assets beyond the reach of creditors, the trustee may recover the proceeds of those fraudulent transfers. "Federal bankruptcy law allows a claimant to bring a fraudulent transfer claim under both federal and state law.  A federal claim is brought under 11 U.S.C. § 548.  A state fraudulent transfer claim may be brought in a bankruptcy case under 11 U.S.C. § 544 and the applicable state provision."  *In re Dayton Title Agency, Inc.*, 724 F.3d 675, 678 (6th Cir. 2013).

Finally, the Bankruptcy Code provides that if any transfer of property is determined to be avoidable or fraudulent, then the trustee may recover either the property or the full value of it from the transferee.  "[T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."  11 U.S.C. § 550.

This Court has found no Sixth Circuit precedent directly answering the question posed by the plaintiff's motion, but the rule has been well established by the Supreme Court and the courts of appeals that the trustee in an avoidance or fraudulent transfer action is entitled to recover the full value of the property at issue without regard to the amount of unsecured claims that it ultimately

may be used to satisfy.  For instance, in *In re JTS Corp.*, 617 F.3d 1102 (9th Cir. 2010), the Ninth Circuit held that "the trustee was entitled to fully recover, even if [the estate may] receive[] a windfall, because (1) recovery would ensure that [the debtor] would perform its obligations under its reorganization; (2) recovery would allow the estate to be reimbursed for pursuing the fraudulent transfer action; and (3) [the debtor] had actual fraudulent intent and did not deserve between the two parties to receive a benefit."  617 F.3d at 1113-14 (citing *In re Acequia, Inc.*, 34 F.3d 800, 811-12 (9th Cir. 1994)).  As the Ninth Circuit observed, the trustee's right to recovery depends only on establishing that at least one claim exists in the estate by a creditor with a right to recover, without regard to the size of the claim.  *Id.* at 1112 (citing *In Moore v. Bay*, 284 U.S. 4, 5 (1931).

The Eighth Circuit also has held that once the trustee identifies any creditor with an allowable claim and a valid right to recovery, then she may proceed to recover the entire value of any property improperly transferred.  Under 11 U.S.C. § 550(a), the court explained, the trustee may recover the full value of the property "for the benefit of the estate."  *Stalnaker v. DLC, Ltd.*, 376 F.3d 819, 823 (8th Cir. 2004).  Moreover, "[t]he trustee's recovery is not limited to the value of the claim of the unsecured creditor(s) he identifies."  *Ibid.* (citing *Liebersohn v. IRS (In re C.F. Foods, L.P.)*, 265 B.R. 71, 86 (Bankr. E.D. Pa. 2001)).

It is not necessary for the trustee to tie a particular asset to a specific creditor's claim.  "[I]f any unsecured creditor could reach an asset of the debtor outside bankruptcy, the Trustee can use § 544(b) to obtain that asset for the estate."  *In re Leonard*, 125 F.3d 543, 544-45 (7th Cir. 1997).  And the amount of the claim need not equal or exceed the value of the property sought by the turnover order.  "Even if [the trustee] cannot point to creditors whose claims total  more than the

value of the land, the Trustee can avoid the transaction entirely." *Ibid.* (citing *Moore v. Bay*, 284 U.S. 4 (1931)).

That point is emphasized by the Fifth Circuit's holding that "[a] bankruptcy trustee may still have standing to avoid a fraudulent transfer after the unsecured creditors are satisfied in full.  The fraudulent transfer injured the estate and § 550 ensures that the injury is redressed because a trustee may only avoid a transfer to the extent it benefits the estate." *In re Mirant Corp.*, 675 F.3d 530, 534 (5th Cir. 2012).

The question of the ultimate equitable distribution of any property recovered as a result of avoidance or fraudulent transfer claims is separate from the issue whether the transfers in question are to be voided, and in any event the Bankruptcy Code provides that any excess property which remains after all creditor and administrative claims have been satisfied reverts to the possession of the debtor.  Any putative "excess" recovery therefore is not a "windfall" for the estate, but simply the rightful property of it.  *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 797 (7th Cir. 2009) (citing 11 U.S.C. § 726(a)(6)).

When viewed against this framework, the defendants' motion for partial summary judgment must be denied.  The defendants have failed to advance any legal or factual basis for their contention that they are entitled to judgment as a matter of law limiting the "scope of damages" the trustee can recover to the nominal amount of a judgment held against the debtor by one unsecured judgment creditor.  The judgment rendered in the Oakland County case speaks for itself on the question of who is entitled to enforce it, and as the trustee correctly points out, the present case is not an action to enforce that judgment.  If the trustee prevails on her claims to void allegedly fraudulent transfers, then she may recover the entire value of the property improperly transferred without regard to the

-16-

amount of claims held by any of the estate's unsecured creditors, or all of them.  Moreover, the complaint seeks damages for breach of fiduciary duty and breach of contract that conceivably could exceed the nominal amount of any judgment creditor's claim, perhaps by a significant amount.

### C.  Motions to limit expert testimony

The defendants contend that the report of plaintiff's expert forensic accountants Harry Cendrowski and James Martin should be stricken and their testimony excluded because the only opinion set forth in their report concerns a strictly legal conclusion premised upon an extended discussion and analysis of case law and legal principles.  The defendants believe that the report offers no other expert analysis that would be helpful to the fact finder in understanding the evidence of financial dealings of the Miller entities.  Although the defendants apparently seek to exclude the Cendrowski report in its entirety, they "highlight" in particular only Section VI ("Alter-Ego Discussion") and Section VIII(A) ("Opinion: Miller Chicago is [the] Alter Ego of Miller Detroit.") as setting forth impermissible legal conclusions.

The plaintiff responds with an answer in opposition and a "me too" motion of her own.  She argues that the testimony of defendants' expert Patrick J. Dunleavy should not be allowed.  She observes that Mr. Dunleavy offers opinions on several of the same subjects on which Messrs. Cendrowski and Martin opine.

Any challenge to expert testimony must begin with Rule 702 of the Federal Rules of Evidence, which was modified in December 2000 to reflect the Supreme Court's emphasis in *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), on the trial court's gate-keeping obligation to conduct a

-17-

preliminary assessment of relevance and reliability whenever a witness testifies to an opinion based on specialized knowledge.  Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The language added by the amendment to Rule 702 restates *Daubert*'s insistence on the requirements that an expert's opinion be based on a foundation grounded in the actual facts of the case, that the opinion is valid according to the discipline that furnished the base of special knowledge, and that the expert appropriately "fits" the facts of the case into the theories and methods he or she espouses.  *See Daubert*, 509 U.S. at 591-93.  Before an expert may give an opinion, the witness must be qualified to do so.  *See id.* at 1348-50; *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998).  The proponent of expert testimony must establish all the foundational elements of admissibility by a preponderance of proof.  *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

"Federal Rule of Evidence 704(a) states that '[a]n opinion is not objectionable just because it embraces an ultimate issue.'"  *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 322 (6th Cir. 2014) (quoting Fed. R. Evid. 704(a)).  "Nonetheless, a witness may not testify to a legal conclusion."  *Ibid.* (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)) (affirming exclusion of experts' "ultimate opinion that a conspiracy likely existed among the defendants during the class period," because "[s]uch a conclusion embraces a legal conclusion which depends on anti-trust doctrine in which [the experts] are not qualified to offer an opinion").  Expert testimony "may not

'define legal terms,'" and mere "[r]ecitation of legal principles . . . is not appropriate expert testimony." *Killion v. KeHE Distributors, LLC*, 761 F.3d 574, 592-93 (6th Cir. 2014) (quoting Fed. R. Evid. 704(a); *Berry*, 25 F.3d at 1353). Expert testimony that "attempts to tell the jury what result to reach and which runs the risk of interfering with a district court's jury instructions, hardly can be viewed as being helpful to the jury." *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) (citing Fed. R. Evid. 702). Thus, exclusion of such testimony may be appropriate "on the ground that it would not be helpful to the trier of fact." *Ibid.*

The defendants' and plaintiff's motions will be granted in part. The respective expert witnesses may not express legal conclusions, or attempt to "recit[e] legal principles" or definitions of legal terms. *Killion*, 761 F.3d at 592-93.

As to Harry Cendrowski (the plaintiff stated at argument that she does not intend to call James Martin), the defendants did not challenge specifically sections I through V or VII of the Cendrowski report, which consist almost entirely of excerpts and summaries of correspondence and financial reports, with some commentary as to their significance. The facts recited presumably would be offered during the trustee's case-in-chief through appropriate documents and testimony of other witnesses with personal knowledge. The commentary in those sections, so far as it goes, will be allowed, assuming a proper foundation is laid. Although designated as an "observation" rather than an "opinion," the conclusion in section VIII(C) that payments on certain promissory notes nominally were recorded but never actually were made certainly represents a permissible expert opinion as to the significance of the accounting entries and other correspondence relating to those payments discussed in detail in the earlier sections of the report. Likewise, the "observation" in section VIII(D) that Miller Detroit was insolvent during periods in which it continued to make

-19-

payments and transfers to Miller Chicago and other parties is a financial opinion properly derived from an expert analysis of the company's books.

Section VI of the report, however, consists of nothing more than an extended recitation of legal principles relating to the concept of *alter ego*. Testimony about the significance of certain transactions and their conformance (or lack of conformance) with prudent and customary practices of corporate governance is permissible. But direct testimony by the experts that involves application of the governing law to the facts or analysis of whether the various "factors" relevant to an *alter ego* determination have been satisfied will be excluded. Those opinions would be beyond the expertise of these witnesses and unhelpful to the jury. Likewise, the "opinion" expressed in section VIII(A) that Miller Detroit operated as an *alter ego* of Miller Chicago will be excluded as an improper legal conclusion. Similarly, although not designated as an "opinion," the commentary on the "fraudulent transfer timeline" set forth in section VIII(B) will be excluded to the extent that it expresses the opinion that any transfers discussed were in fact fraudulent.

As to Patrick G. Dunleavy, the trustee does not challenge the defendants' expert's qualifications to express certain opinions that are within his areas of expertise in finance and accounting. However, testimony parroting the sections of the Dunleavy report headed "Underlying Issues" and "Dunleavy's Opinion" will be excluded, because it would contain the same impermissible recitation of legal principles and legal conclusions as the trustee's experts offer in their report. The trustee does not challenge any other specific sections of Dunleavy's report, which, although not expressly labeled as "opinions," consist almost entirely of recitations of facts gleaned from certain accounting records and commentary on the financial significance of them, along with

-20-

an extended (and permissible) criticism of the accounting and analytical methods employed by the trustee's experts.

The expert witnesses may not offer legal opinions or define legal terms. The motions will be denied in all other respects.

<div align="center">III.</div>

The Court finds no merit in the defendants' motion seeking to limit their damages exposure. The expert witnesses' testimony will be limited in accordance with the discussion above.

Accordingly, it is **ORDERED** that the defendants' motions for setoff [dkt. #114] and for partial summary judgment [dkt. #116]  are **DENIED**.

It is further ordered that the motions to limit or exclude expert testimony [dkt. #115, 117] are **GRANTED IN PART AND DENIED IN PART**.

<div style="text-align:center; margin-left:40%">s/David M. Lawson<br>DAVID M. LAWSON<br>United States District Judge</div>

Dated:   January 12, 2015

<div style="border:1px solid black; text-align:center;">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 12, 2015.

s/Susan Pinkowski<br>SUSAN PINKOWSKI

</div>