UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

K. JIN LIM as TRUSTEE OF MP LIQUIDATING
CO. LLC,

                Plaintiff,                  Case Number 11-14422
                                        Honorable David M. Lawson

v.

MILLER PARKING CO., JAMES N. MILLER
REVOCABLE TRUST UTA, NATHAN L.
MILLER TRUST, ALISON J. MILLER TRUST,
DAVID M. MILLER TRUST, and JAMES N.
MILLER,

                Defendants.
_____/

## OPINION AFTER TRIAL

This case focuses on the assets of the Miller family, and its late patriarch Bruce Miller, that

have been accumulated through various businesses in Detroit and Chicago, which owned or operated

several urban surface parking lots and parking structures.  Miller Parking Company LLC, known

throughout this lawsuit as "Miller Detroit," filed for bankruptcy protection after a $3 million

judgment was entered against it in the Oakland County, Michigan circuit court on June 30, 2009.

Plaintiff K. Jin Lim, the bankruptcy trustee of Miller Detroit (now known as MP Liquidating Co.

LLC), filed the present action against James N. Miller (Bruce Miller's son, who also was the

president of Miller Detroit), another family business, which was an Illinois corporation called Miller

Parking Company (Miller Chicago), and Bruce Miller's other children and grandchildren (Janet

Stein, Andrew Stein, Matthew Stein, Amy M. Weinstein, Benjamin Weinstein, Emily Weinstein,

Nathan L. Miller, Alison J. Miller Goldstein, and David M. Miller), and their respective trusts.

Under various theories, Lim alleged that Miller Detroit funneled many of its assets to Miller

Chicago, that Miller Chicago is the *alter ego* of Miller Detroit, and that both companies made fraudulent transfers to the detriment of the bankruptcy estate that should be set aside.

Miller Detroit did not own parking facilities; instead, it provided administrative services to parking facilities owned by other entities, several of which included James and Bruce Miller as partners or shareholders. The events that precipitated the bankruptcy can be traced to 2004, when Alan Ackerman — a business associate of Bruce Miller for many years — and his company CH Holding (which owned a surface parking lot in Detroit and dealt with Miller Detroit) sued Bruce Miller and Miller Detroit in state court following a breakdown in the business relationship between the partners and their respective companies. James Miller was then the president of Miller Detroit and a principal shareholder and officer of Miller Chicago. In February 2009, while the Oakland County case was pending, a third party that held a long-term lease on Miller Chicago's major capital asset, the Bismark Parking Deck in Chicago, exercised an option in the lease to buy the deck. When the sale closed, Miller Chicago was left with no ongoing operations or major assets other than cash from the sale. On June 30, 2009, Ackerman won a judgment in the Oakland County case against Miller Detroit and Bruce Miller for approximately $3 million. In September 2009, James Miller distributed approximately $9 million in cash and other assets held by Miller Chicago to its shareholders, who consisted of the Miller children and grandchildren and their trusts (but not Bruce Miller or Miller Detroit). Not long after, James Miller dissolved the Chicago company. On October 7, 2009, Miller Detroit filed for bankruptcy.

On October 7, 2011, Lim filed her complaint in this case, alleging that James and Bruce Miller commingled the affairs of their two companies and carried out a fraudulent scheme to funnel assets from Miller Detroit to Miller Chicago, in order to evade creditor claims against Miller Detroit.

-2-

On January 11, 2013, after the Court granted Lim's motion to amend, Lim filed a nine-count amended complaint. In Count I of her amended complaint, the trustee alleges that certain payments by Miller Detroit to Miller Chicago made within the twelve months before the bankruptcy filing date are voidable under 11 U.S.C. §547(b). In Counts II and III, she contends that payments and other transfers made by Miller Detroit to the defendants during the two years before the bankruptcy filing date — and after Ackerman and CH Holding obtained their judgment — are voidable as fraudulent transfers under 11 U.S.C. §§ 548, 544(b)(1), and Michigan Compiled Laws §§ 566.34-36. In Count IV, the trustee alleges that the distributions by Miller Chicago to its shareholders are voidable. In Counts V and VI the trustee seeks substantive consolidation of Miller Chicago and Miller Detroit and a judicial determination that Miller Detroit was the *alter ego* or a mere instrumentality of Miller Chicago for the purposes of the bankruptcy proceedings. In Count VII, the trustee seeks damages for alleged breaches of fiduciary duty by defendant James N. Miller in his capacity as president of Miller Detroit. In Count VIII, the trustee alleges a breach of contract on the premise that Miller Detroit is entitled to payments from Miller Chicago of $4.6 million according to a spreadsheet provided by defendant James N. Miller. Finally, in Count IX, the trustee seeks an accounting of all transactions involving the Detroit and Chicago entities, alleging that the defendants have failed or refused to provide any accurate disclosure of the consideration received in exchange for certain promissory notes issued by Miller Detroit to Miller Chicago or the various payments made under those notes and other arrangements between the companies.

On February 3, 2015, the Court held a final pretrial conference, where the parties agreed to bifurcate the proceedings and submit the claims raised in Count IV (disgorgement), Count V (substantive consolidation), Count VI (*alter ego*), and Count IX (accounting) for decision by the

Court sitting without a jury; the remaining claims, if appropriate, would be tried by a jury later. The Final Pretrial Order directed that those claims be presented at a bench trial.

The case came on for trial before the Court without a jury on February 17, 2015, with the proofs concluding on March 10, 2015. The plaintiff's attorney indicated on the first day of trial that he would not make any presentation on the request for an accounting. Despite its equitable nature and the direction in the final pretrial order, plaintiff's counsel believed that the demand for an accounting related solely to the deferred claims such as those for fraudulent transfer, which were reserved for later decision by a jury. For the purpose of this trial, the Court finds the claim in Count IX abandoned.

The Court heard the testimony of eleven witnesses and received 438 exhibits. The parties also submitted several stipulations of fact that were incorporated in the joint final pretrial order. The parties filed post-trial briefs and proposed findings. The Court ordered the parties, when submitting their proposed findings of fact, to support each assertion with a reference to testimony or an exhibit in the record. However, both parties cited certain exhibits that were not received in evidence. The following constitutes the Court's findings of fact under Federal Rule of Civil Procedure 52(a)(1), based on the record evidence, followed by its application of the governing law.

## I.  FACTUAL FINDINGS
### A.  Personal and Business Genealogy

The Miller family's involvement with car parking services began with Bruce Miller's father, Nathan V. Miller. In 1935, Nathan joined a company called Chicago Service Parking Co., an Illinois corporation that was incorporated on October 23, 1933. Bruce Miller joined the company in 1959. The shareholders of that corporation varied over the years. Bruce Miller became a shareholder in 1957. The company qualified to do business in Michigan in 1974. In 1983, the shareholders, which

included other Miller family members, changed the name of the corporation to Miller Parking Company (referred to in this opinion as "Miller Chicago"). In 1999, the corporation was converted to an "S" corporation under the Internal Revenue Code. James Miller was a corporate officer as early as 1994.

Miller Chicago constructed the Bismark Deck, a 460-car parking garage in downtown Chicago. The corporation also owned and operated several other parking properties in Chicago. In 1998, Miller Chicago sold its interests in various parking entities to Parking Properties, LLC, which was owned by Bruce Miller, his children, and grandchildren. The transaction was seller financed, with $250,000 paid at closing and the balance in a note for $4,400,000. Bruce Miller gifted his interest in Miller Chicago to his children and grandchildren, so that by early 2002 he no longer had any financial interest in that company. However, during the times relevant to this lawsuit, the directors of Miller Chicago were James Miller, Bruce Miller, and Bruce's wife Doris Miller. James Miller was the president, and his wife, Arleen, was the secretary of Miller Chicago.

By the end of 2001, Miller Chicago owned four parking properties in Chicago. In August 2000, it entered into an agreement with Standard Parking, which took over the operations of the lots (including the Bismark Deck). Miller Chicago sold off most of the lots, but continued to own the Bismark Deck until it was sold in 2009. From August 2000 onward, Miller Chicago functioned essentially as a landlord, receiving income from its parking properties and distributing the revenue to its shareholders. It closed its administrative office in Chicago on September 30, 2000. Thereafter, administrative functions were performed by Miller Detroit in Detroit.

Bruce Miller was married to Doris Miller; they had three children: James N. Miller, Amy M. Weinstein, and Janet Stein. James first received shares in Miller Chicago in 1976, and his sisters

first received shares in 1978.  Bruce Miller systematically divested himself of his shares by gifting them to his children and grandchildren or their trusts.  He held approximately one-fourth of the shares in 1998, and by February 2002 the transfers were complete, so that Bruce held no shares of the company.  By then, the shareholders were James N. Miller, Nathan L. Miller, Alison J. Miller Goldstein, David M. Miller, Janet Stein, Andrew Stein, Matthew Stein, Amy M. Weinstein, Benjamin Weinstein, and Emily Weinstein or their respective trusts.

Miller Detroit began as a partnership of Bruce Miller and his father, Nathan Miller, in 1961. That company provided management services to the owners of approximately 20 different parking facilities.  It did not itself own any parking facilities.  After Nathan died in 1975, Bruce Miller was the sole owner of the business.  In 2000 it was converted to a limited liability company, and simultaneously Bruce Miller assigned his interest to his trust, which was the sole member of the LLC.  James Miller worked for Miller Detroit throughout most of his working life, eventually becoming its president and assuming most of the day-to-day management responsibilities after 2000. Arleen Miller was named the vice-president until she passed away.

Bruce Miller passed away sometime after 2009, after he filed for personal bankruptcy protection and Miller Detroit filed for bankruptcy.

### B.  Business Operations

Bruce Miller managed the general affairs of Miller Detroit, and he made the day-to-day operational decisions through 2000.  In that year, James Miller — who had worked for the company since his graduation from law school in 1978 — was given more responsibilities for operational decisions.  James was given the title of president, and he and Bruce were co-managers.  In January of that same year, the company hired Aaron Gerstman as controller; his responsibilities included

-6-

maintaining the books and records of the company. The company kept a single bank account from which it paid the operational expenses of its client parking facilities. Bruce Miller had a financial interest in some of those facilities. Miller Detroit acted as a "common paymaster" for those entities, and it kept separate internal accounts for each of them, which were reconciled each month.

One of Gerstman's tasks was to modify Miller Detroit's computer system so that the separate client accounts were accurate. He completed the journal entries for all of the accounts payable on August 24, 2001. At that time the balance sheets for the client entities were fully reconciled with the income statements.

Miller Detroit also provided administrative services of sorts for Miller Chicago, although after 2000 there was not much to be done, since Miller Chicago had no responsibility for the day-to-day operation of any parking facility. It did, however, have obligations and made distributions to its shareholders, which Miller Detroit handled. Unlike the other client entities, Miller Chicago maintained its own bank account.

After Miller Chicago signed its operations agreement with Standard Parking in August 2000, it no longer was involved in the business of running parking facilities. As noted above, it continued to own its remaining assets, but it functioned essentially as a landlord, receiving income from its parking properties and distributing the revenue to its shareholders. The shareholders — all Miller family members — allowed many of their personal expenses to be paid by the corporation. Miller Detroit generally paid those bills as the "common paymaster" for all the parking entities, and then the accounts were reconciled, the expense payments were accounted for as shareholder distributions, and appropriate taxes were paid.

## C.  Bruce Miller's Income Stream

Bruce (and, presumably, Doris) Miller apparently became accustomed to a comfortable level of income, which at one time he derived from his interests in the parking properties in which he invested, including Miller Chicago.  One principal source of income was the Center Garage, located adjacent to the Renaissance Center in Detroit.  However, distributions from that source started to dwindle in 2004 (well after he gifted away his interest in Miller Chicago), and Bruce Miller apparently perceived a shortfall.  He took no salary from Miller Detroit in 2003 and 2004, but he took partner draws from Miller Detroit in 2003 and 2004 to supplement his Center Parking income.  Miller Detroit did not have the cash flow to support the payments to Bruce Miller during this time, so Miller Detroit borrowed the cash from Miller Chicago.

Initially, James Miller and his siblings were sympathetic to Bruce and Doris Miller's financial situation.  They agreed at first to Bruce Miller's demands for distributions from Miller Detroit, understanding that Miller Detroit borrowed money from Miller Chicago to pay Bruce Miller's "partner draws" from Miller Detroit.  The money that Bruce Miller received was money that would have been distributed to the Miller Chicago shareholders.  However, the shareholders (Bruce Miller's children and grandchildren) consented to the money being transferred from Miller Chicago into Miller Detroit so that Miller Detroit could then pay it out to Bruce Miller.  The transfers were structured to provide Bruce Miller and his wife money to live.  The two entities treated the transfers as inter-company loans from Miller Chicago to Miller Detroit.

That was not a new practice, however.  There was a $950,000 obligation owed by Miller Detroit to Miller Chicago that was carried on the company books, which was for money Bruce Miller took from Miller Detroit, funded by Miller Chicago, before 2004.

-8-

Bruce Miller had little or no involvement in the business operations of Miller Chicago after 2000. He underwent brain surgery around January 28, 2004, and thereafter his ability to work at Miller Detroit was significantly diminished. He remained involved in the major business decisions of Miller Detroit, but not the day-to-day activity. Before 2005, Bruce Miller took approximately $2,000,000 in partner draws from Miller Detroit. When he asked for money that Miller Detroit did not have, the money came primarily from Miller Chicago. Miller Detroit did not have the money to fund Bruce Miller's significant funding needs from 2005 through 2008 approximating $1.7 million. That amount, likewise, was funded by Miller Chicago.

Miller Chicago converted certain loans to Bruce Miller into salary when Bruce Miller had no apparent ability to repay. He received $744,000 in salary from Miller Chicago in 2007; his salary was grossed up to cover income taxes, which were paid to taxing authorities. As a Miller Chicago shareholder, Janet Stein understood that, if monies were distributed to Bruce Miller from Chicago through Detroit, the Miller Chicago shareholders would get less. Miller Chicago generally made quarterly distributions of $75,000 to its shareholders. Distributions for March, June, and December 2003 and March and December 2004 were made with resolutions memorializing the events properly executed. After Janet Stein sold her interests in the company, the distributions became $65,808.93 per quarter. In January and February 2009, all of the shares of Miller Chicago were owned by Bruce Miller's children and grandchildren. In view of this, the plaintiff's accounting witness, Harry Cendrowski, testified that the decision of Mr. Miller's children and grandchildren to allow Bruce Miller to receive money in that way would not violate accounting principles.

There was some effort to document loans made to Bruce Miller from Miller Chicago, other than company book entries. For instance, on April 13, 2004, Miller Chicago loaned Bruce  Miller

$50,000 with interest at the rate of 4.255 % per annum.  A promissory note was prepared to that effect and the loan was approved by the Board of Directors.

In 2008, James Miller, along with his sisters, decided that they would no longer deduct money from their distributions in order to provide money to Bruce Miller.  On December 13, 2008, James Miller sent an email to Miller Detroit personnel Ross Fritson, Aaron Gerstman and Arleen Miller stating that all further payroll to Bruce Miller was to cease.  In response, Gerstman wrote that he already had prepared a check to be issued on December 19.  James Miller replied with instructions to "please void that check."  The last time that Bruce Miller received compensation from Miller Chicago was September 2008.

On December 10, 2008, James Miller wrote a letter to attorney Richard Roth in response to a letter that Mr. Roth had prepared on behalf of Bruce and Doris Miller, stating that "under no circumstances will the shareholders of Miller Chicago be responsible for Bruce and Doris' professional fees or any future fees regarding their personal financial situation.  Doris is not an agent of Miller Parking and has no authority to bind Miller Parking in these matters.  I am the only person with the authority to retain professional services for the company."  In addition, James Miller wrote that he had been pressured by the family "to buy Janet [Stein] out so that she too would not be dependent upon whatever Jim [Miller] decides to do with the Bismark proceeds.  If Amy [Weinstein] does not get her Bismark money as soon as it is available to distribute, I am afraid she will sue me.  Therefore, rather than risk a lawsuit and hard feelings with Amy, I will most likely make some kind of significant distribution to all the shareholders of the Bismark deck proceeds."  Finally, Mr. Miller wrote, "It is only through the goodness of the shareholders' hearts that the money belonging to them would be gifted back to B & D so that they can live."  Last, Mr. Miller wrote, "I am unwilling to

-10-

guarantee a sum certain to Doris, unless it is in the form of her selling an asset back to the shareholders of Chicago, such as Center Parking."

### D.  Intercompany Transactions

From 2000 onward, James Miller and other Miller Detroit employees made efforts to keep the company's books in a way that accurately recorded the various financial transactions for the various entities under management.  It appears that there were two main motives for those efforts.  First, there was a need to allocate administrative expenses among the various parking properties being managed.  Second, there appears to have been a desire on the part of James Miller to justify, and perhaps recapture, the prodigious amounts of cash flowing from Miller Chicago to Miller Detroit that funded the draws and distributions to Bruce Miller.

As to the first motive, Aaron Gertstman implemented a computerized accounting system that processed payments received, issued payroll, wrote checks for the various entities from a single bank account, and tracked the information using tracking numbers in a unified accounts payable system. In March 2000, James Miller sent an email instructing that payroll and expense distributions should be allocated to reflect the reality from week to week.  Miller Detroit allocated office rent, electricity and various other obligations among the parking properties it managed.  Also, certain overhead allocations were made for Miller Chicago in the books.

On May 29, 2001, Gerstman wrote to all employees describing changes to the computer system to allow for statements directly from a ledger for the entities that it was managing. Subsequent emails on May 30 discussed the allocation process and the method of guaranteeing that proper allocations were made as well as an invoicing process.  On August 29, 2001, James Miller stated that Arleen Miller's tasks included regular invoicing and cutting checks for Miller Detroit as

well as for Miller Chicago along with purchase journal reports, check register reports and a reconciliation of those items. She also prepared the corporate filings for two corporations as well as one limited liability company and she set up minute books for Miller Chicago, Miller Valet, Parking Properties, LLC and Miller Detroit.  Personnel discussed allocations for parking overhead regarding properties under management including Center Parking, CH Brand, Lafayette Shelby, Madison Randolph, Miller Parking Detroit, Miller Parking Chicago, and Miller Valet Parking Company.  If an employee at Miller Detroit worked on matters related to another entity, weekly allocations were made.  Allocations of officers' and owners' salaries were made for each year for 2001 and thereafter.

As to the second motive for documenting transactions, James Miller appears to have acted on his concern about the large accumulated debt owed by Miller Detroit to Miller Chicago.  Miller Detroit's cash flow did not create any optimism that the debt would be repaid.  As noted earlier, Miller Chicago had transferred all of its operational obligations to Standard Parking in August 2000. Earlier that year, in March 2000, Miller Chicago entered into an administrative services agreement (ASA) with Miller Detroit.  The agreement called for an 8% management fee to be paid to Miller Detroit, which included "parking consultation" services.  After August of that year, the expenses mentioned in the 2000 ASA for reimbursement should have been minimal, since there was no direct management of the Chicago locations.  Miller Detroit did not track the hours for the consulting services furnished to Miller Chicago.  But Miller Chicago continued to pay its management fees to Miller Detroit.  Gerstman confirmed the payment of management fees by Miller Chicago to Miller Detroit from 2000 to 2004.  He also noted that expenses were reimbursed.

-12-

A new administrative services agreement was executed between Miller Chicago and Miller Detroit on May 26, 2004.  On the same day, Miller Detroit executed a Promissory Note in favor of Miller Chicago in the principal amount of $1,471,444, with repayment terms that included principal and interest payments.  The new administrative services agreement stated that Miller Detroit "shall not be deemed to be an employee, agent, partner, co-venturer or representative of Miller Chicago." Patrick Dunleavy, the defendants' accounting expert, testified that the administrative services agreements were arms length transactions, although at that time Miller Chicago was not on premises operating parking facilities, the new agreement did not call for expense reimbursement, and Miller Detroit continued to charge Miller Chicago for monthly expenses totaling approximately $60-to-70,000 per month.

Nonetheless, Gerstman also testified that Miller Chicago and Miller Detroit abided by the 2004 administrative services agreement, and that expenses were reimbursed from Chicago to Detroit as part of the agreement.  Section 1 of the 2004 agreement, discussing "scope of services," stated that Miller Detroit would assist in managing the day-to-day operations of Miller Chicago's business and would perform such other management, administrative and other services as were mutually agreed upon by Miller Chicago and Miller Detroit.  Gerstman said that the agreement included the payment of costs and expenses, although the specific expenses and services (other than administering the payment of Miller Chicago's shareholders' personal expenses) were not identified.

Miller Chicago was charged substantial increases in administrative expenses, particularly wages, from 2005 through 2008, relating to, among other things, increased salary for Bruce Miller. There is no evidence about Miller Chicago's operations that would suggest a reason for material swings in amounts of wages assessed against Miller Chicago by Miller Detroit during the years 2003

-13-

through 2007.  Allocation of wages for James and Arleen Miller to Miller Chicago increased by more than 100% (while decreasing at Miller Detroit) from 2001 through 2004 despite the same or decreased operations of Miller Chicago.  It does not appear that any of the other properties Miller Detroit managed were subjected to the expense allocations that burdened Miller Chicago.  The amped-up expense burden imposed on Miller Chicago appears to have been James Miller's way of offsetting the substantial debt Miller Detroit was accumulating as a result of the transfer of cash to pay Bruce Miller's distributions.

In August 2004, members of the Miller family entered into a "Round Robin" agreement that restructured the debt obligations of the various parking entities in which the family members had interests.  The agreement, titled "Agreement and Consent to Round Robin Debt Repayment," (along with certain other related agreements, documents, and resolutions) was signed by Miller Detroit, Miller Chicago, Parking Properties LLC, Madison Randolph Associates, JAM Associates, James N. Miller, Amy M. Weinstein, and Miller Parking Valet Company.  The purpose of the agreement was to reduce inter-company balances.  Some debts were reduced and some eliminated, but in the end, Miller Detroit signed a promissory note in favor of Miller Chicago for $841,974.  The parties to the transaction believed that none of them were negatively financially impacted.  Miller Detroit had made monthly payments to Miller Chicago on the May 2004 Note in the amount of $5,404.12 in each month from June 2004 through August 2004.  Miller Detroit made monthly payments to Miller Chicago on the May 2004 Note and the August 2004 Note in the amount of $8,506.11 in each month from September 2004 through September 2009.  There was a conversion feature in each promissory note that allowed conversion of the debt to equity.  A setoff provision in the notes was never used, nor was the conversion feature.

-14-

### E.  CH Holding and Ackerman Litigation

Except for the debt created by Bruce Miller's draws and distributions, Miller Detroit operated profitably and paid its obligations from 2000 through the first half of 2009.  The wheels came off the wagon, however, when a judgment was entered against it in the Oakland County litigation in favor of CH Holding Company and Alan Ackerman.  That litigation, however, had nothing to do with Miller Chicago or its operations.  And the litigation itself, which was commenced on November 4, 2004, did not cause the Miller family members to enter into the various inter-company transactions up to that time.

CH Holding was formed in 1981, when, in August of that year, the company prepared a final offering memorandum for the construction of a parking lot.  The offering circular disclosed that Bruce Miller would be the general partner, who would receive compensation, and management services would be furnished by Bruce Miller d/b/a Miller Parking Company.  The document also disclosed that Bruce Miller was a major stockholder of Chicago Service Parking Company.  Ackerman invested in CH Holding in 1981 and became a limited partner.  James Miller also was a limited partner.  Ackerman testified that when he made his investment, he knew that Bruce Miller's interests in what is now called Miller Chicago were separate from his role on behalf of what was then the Miller Detroit partnership.

Around that same time, Brandoff Corporation — which owned land adjacent to the parking lot developed by CH Holding — entered into an agreement with CH Holding to create CH Brand Parking Associates partnership.  CH Holding became the managing partner of CH/Brand.  The formation of that new entity allowed two parcels to be joined as one larger parcel for the development of a parking facility near the Greektown Casino in Detroit.

-15-

After 2000, Ackerman was paid his partnership distributions from CH Holding on checks from Miller Parking Company, LLC. He also testified that he received a regular breakdown of parking revenues from CH Holding and received the amounts of money he was supposed to receive as a limited partner. However, on November 16, 2000, Ackerman wrote a letter to James Miller stating that he wanted to be "out" of CH Holding. And on December 13, 2000, an attorney representing Ackerman sent a letter to Bruce Miller regarding the series of transactions between CH/Brand Parking Associates, Miller Detroit, and Greektown Casino. But Ackerman did not threaten or bring a lawsuit until 2004. No litigation was contemplated or commenced by any creditor of Miller Detroit at the time that Bruce Miller began and finished gifting his stock in Miller Chicago to his children and grandchildren.

Ackerman and CH Holding did sue Miller Detroit and Bruce Miller after two offers to purchase the parking lot failed to result in a timely sale. They accused Miller Detroit and Bruce Miller of breaching fiduciary duties when Bruce Miller insisted on inserting clauses in leases and sales agreements that required Miller Detroit to be the exclusive manager of the parking facility. The result, they alleged, was that Bruce Miller failed to maximize Ackerman's and CH Holding's investment, and inclusion of the clauses caused the potential sales to fall through. The November 2004 lawsuit eventually came to trial in June 2009. After a jury returned a verdict in favor of the plaintiffs in that case, the court entered judgment on June 30, 2009 for Ackerman against Miller Detroit for $625,784.71, and for CH Holding against Miller Detroit for $3,101,835.83. A substantial judgment also was entered against Bruce Miller.

Those judgments forced Miller Detroit into bankruptcy. A voluntary petition was filed on October 9, 2009. Shortly thereafter, Bruce Miller followed suit, filing a bankruptcy petition on

-16-

October 20, 2009.  Miller Detroit's bankruptcy trustee operated the business for two months.  James Miller formed a company called Miller Parking Services, LLC, which purchased the assets of Miller Detroit (including its management contracts) from the bankruptcy estate on December 1, 2009.  He testified that he has operated that new business profitably.

### F.  Dissolution of Miller Chicago

Meanwhile, James Miller was working with the other shareholders of Miller Chicago to close the sale of the Bismark Deck in early 2009.  That transaction, however, was put in motion in 2002, when Robert Caplin signed a ten-year lease on the Bismark deck on behalf of Next Realty, LLC.  The lease included an option to purchase, which could not be exercised until after January 1, 2009.  Miller Chicago had been converted to an S corporation on January 1, 1999, and a sale of the property within ten years of that date would have caused adverse tax consequences to the corporation.  Caplin elected to exercise its option to purchase the Bismark Deck in late 2008.  The sale closed in February 2009 for $20 million, resulting in net proceeds to Miller Chicago of $9,764,654.

Much earlier, on September 23, 2003, James Miller wrote to his two sisters that he had a fiduciary duty to all of the shareholders of Miller Chicago, and he did not wish to place himself in a position where any of his actions could be challenged by third parties.  He committed to distribute the proceeds of a potential future sale of the Bismark Deck with an understanding that a certain amount of proceeds would be held back to pay expenses and to provide a reasonable reserve for possible contingencies.  Miller also wrote that he understood that his sisters were desirous of creating order in their life and certainty in their future independent from Jim Miller and Miller Chicago.  He promised his sisters that he would distribute most of the net sale proceeds from the

Bismark Deck to the shareholders of Miller Chicago and that those amounts would be reduced only by fair reserves for contingencies of Miller Chicago.

In contemplation of the sale, a Miller family meeting was held in early January 2009. There was tension among the family members caused in part by discord over the future of Miller Chicago. James Miller desired to preserve the family businesses and use the sale proceeds for that purpose; his sisters wanted to cash out. And there was a dispute among the three Miller siblings as to how Bruce and Doris Miller would be supported. The discussions persisted for eight months, until a plan of dissolution of Miller Chicago was signed on August 24, 2009. During that period, Andy Jacobs, a family friend, was called in to help mediate the disputes among the siblings. During some of the discussions, Arleen Miller, James Miller, and his sisters expressed concern over the judgment Mr. Ackerman had obtained and how he might try to reach the assets of Miller Chicago.

Janet Stein had signed an agreement in May 2004 selling her interest in Miller Chicago and all the other Miller family businesses, for which Miller Chicago tendered a promissory note to her for $1,199,250. After the Bismark Deck sale closed, the balance on that note was paid. In May 2009, James Miller agreed to distribute $1.5 million to the shareholders of Miller Chicago.

The redemption agreement called for a two-step process. First, all of the shareholders would be bought out; and second, James Miller would receive certain assets and sign the final dissolution documents. The agreement required that claims and obligations be paid, and a reserve was established for contingent claims. Robert Gordon, an attorney who drafted the papers, did not believe that there were any claims or threats of litigation against Miller Chicago at that time. No provision was made for the claims that Ackerman or CH Holding had against Bruce Miller and Miller Detroit. By September 3, 2009, the following transactions had been completed: (1)

-18-

redemption of shareholders of Miller Chicago; (2) purchase of membership interests in Parking Properties, LLC; (3) purchase of membership interest in JAM Associates; (4) purchase of shares of Miller Parking Valet Company, and (5) liquidation and dissolution of Miller Chicago. On September 5, 2009, Miller Chicago assigned to James Miller all of its interest in certain promissory notes and accounts receivable. Following the Plan of Dissolution and Liquidation of Miller Parking Company, Miller Chicago was dissolved after all of its assets had been liquidated. Neither Bruce nor Doris Miller received any money from the redemption.

### G.  The Companies' Separate Identities

The plaintiff asserts that Miller Detroit was a "mere instrumentality" of Miller Chicago, but the evidence does not support that conclusion. Certainly, although Miller Detroit was profitable during the relevant time period on an operational basis, it relied extensively on substantial influxes of cash from Miller Chicago. But those cash payments — either through loans or the revenue from the questionable charges under the administrative services agreements — went primarily, if not exclusively, to support Miller Detroit's payments to Bruce Miller. Because Miller Chicago had little to no operational expenses after August 2000, but enjoyed a substantial income stream from its existing leases, the money that went to Miller Detroit came directly from the shareholders' pockets. The decisions to authorize those payments were made by the Miller Chicago shareholders, not Bruce Miller. And there is substantial evidence that the shareholders were not always of one mind on those decisions, which ultimately led to the cessation of those "maintenance payments" to Miller Detroit in December 2008.

-19-

Miller Detroit also relied on concessions from other family-owned businesses. For instance, it deferred payments to the Madison Randolph, Lafayette Shelby, and Miller Valet partnerships. But that did not make Miller Detroit an "instrumentality" of those entities.

Miller Detroit did maintain separate books and records for each of the entities with which it had management agreements. It also kept its records separate from those of Miller Chicago, particularly after August 2001, when Aaron Gerstman implemented an electronic accounting system. The detail and backup documents were not kept with the precision one might expect from a Fortune 500 company. However, the journal entries and level of detail were sufficient to separate the financial dealings of the discrete family-owned business and other closely-held entities for which Miller Detroit was providing management services. Miller Detroit acted as a common paymaster for those entities and used a common bank account. Miller Chicago maintained its separate bank accounts, however. It also filed separate tax returns.

There is no substantial evidence that Miller Detroit and Miller Chicago held themselves out to the public as the same entity. Nor did they commingle expenses or revenues. The plaintiff points to a consolidated cash flow projection from 2002 as evidence of combining the businesses of the two entities. But that exhibit appears to be an internal accounting document, and it plainly separated the revenue from each of the entities, representing them as discrete revenue streams. Similarly, the plaintiff cites a bid presentation from 2002 in which all of the Miller family-owned entities were identified. But a careful reading of that document discloses that the several family businesses each were identified separately; they were not represented as a consolidated entity, nor were they held out as commonly owned.

-20-

And, as noted earlier, Miller Detroit identified by appropriate journal entries the expenses it paid on behalf of the Miller Chicago shareholders and regularly reconciled those entries.  As part of the administrative services Miller Detroit furnished to Miller Chicago, Miller Detroit paid the personal expenses for the Miller Chicago shareholders, which were allocated to each shareholder and charged as shareholder distributions appropriately paid by Miller Chicago.  Miller Detroit also paid other benefits for non-employee family members, such as Doris Miller, and other expenses of Bruce Miller.  None of those payments, however, were charged to Miller Chicago.

Miller Chicago and Miller Detroit had common management in the person of James Miller. By 2009, James was the president of Miller Detroit.  From 1978 through 2014, James worked in both Detroit and Chicago.  He worked for various property owners, including Miller Chicago.  He managed lots in Chicago that were owned by Miller Chicago.  James was the sole shareholder of Miller Valet, which was created in the 1990s.  At one time, he operated the business with Marty Stein, his ex-brother-in-law.  Marty Stein was married to his sister Janet.  They underwent a hotly-contested divorce.

Miller Chicago and Miller Detroit used the same professional service providers, such as accountants and attorneys.  Other employees performed work for both entities, such as Aaron Gerstman and Arleen Miller.  The two companies operated from the same office in Detroit after 2000, using a common telephone number, letterhead, and website.  There is no evidence, however, that any person or entity was misled into believing that the two entities were one and the same.

Finally, Miller Chicago observed customary corporate formalities.   Following Bruce Miller's divestment of his shares in Miller Chicago, the shareholders held annual meetings and conducted themselves according to the requirements of the Illinois Corporation Act.  Arleen Miller

was the Secretary of Miller Chicago from May 1, 2000 through 2009, and she maintained the minutes in a loose leaf binder that was stored in the Miller Detroit office. The Secretary of Miller Chicago also maintained stock certificates that were issued to each shareholder. All corporate documents, including the stock certificates, were kept in a binder that was on the premises when the bankruptcy trustee took control of the Miller Detroit office. The plaintiff's accounting expert, Harry Cendrowski, noted that, for the most part, the historical corporate documentation of Miller Chicago was maintained in a manner that was customary for a properly documented company.

## II. CONCLUSIONS OF LAW
### A. Choice of Law

The *alter ego* claim arises under state law, but the parties do not agree on which state's law governs. The plaintiff advocates for Michigan law, arguing that virtually every act of significance occurred in that state and James Miller is located there. The defendants insist that Illinois law governs because the plaintiff seeks to pierce the veil of an Illinois corporation.

Federal courts generally follow the choice-of-law rules of the forum state when deciding state-law claims pendent to federal questions. *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136 (6th Cir. 1996). However, the "'"initial task of a choice-of-law analysis is to determine whether there is an actual conflict between the substantive law of the interested jurisdictions."'" *In re Appalachian Fuels, LLC*, 493 B.R. 1, 18 (B.A.P. 6th Cir. 2013) (citing *Levin v. Dalva Brothers, Inc.*, 459 F.3d 68, 73 (1st Cir. 2006)). In this case the choice-of-law dispute is insubstantial, because there is no material difference in the elements of an *alter ego* claim under Michigan and Illinois law.

The focus of the parties' dispute is on the contours of a specific element of the *alter ego* cause of action: that the corporation whose separate identity the plaintiff seeks to disregard was used to commit a fraud or wrong. More specifically, they disagree on the type of proof necessary to

-22-

satisfy that element.  Relying primarily on *Sea-Land Services, Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir. 1991), the defendants argue that the plaintiff must show more than simply that a judgment creditor's recovery on its judgment might be obstructed or reduced.  In that case, after undertaking a searching examination of Illinois *alter ego* case law, the court found that "the courts that properly have pierced corporate veils to avoid 'promoting injustice' have found that, unless [they] did so, some 'wrong' beyond a creditor's inability to collect would result," concluding that proof of the plaintiff's "unsatisfied judgment was [not] enough." *Id.* at 524.  The defendants contend, therefore, that the plaintiff here must prove that "honoring the separate corporate existences of the defendants 'would sanction a fraud or promote injustice.'" *Id.* at 522 (quoting *Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565, 570 (7th Cir. 1985)).

The plaintiff, on the other hand, contends that, under Michigan law, as to the "fraud or wrong" element of her claim, it is sufficient to show that the Miller Detroit estate or its creditors would suffer as a result of wrongs perpetrated by the alleged *alter ego* entity.  She cites *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 800 (6th Cir. 2007), for that idea, pointing to this language: "[T]he fact that [the plaintiff] suffered losses from [the defendant subsidiary's] breach of contract is sufficient to constitute an unjust loss for the purpose of veil-piercing liability."  However, that quote addresses an element of an *alter ego* claim that is separate from the "fraud or wrong" element, which, as discussed below, *also* must be proven.  As the *Servo Kinetics* court observed, "[i]f a jury finds that Moog [the parent] subsequently used TSS [the subsidiary] as an instrument to commit an injurious fraud or wrong, piercing the corporate veil is proper." *Ibid.*

-23-

The plaintiff also cites *Pfaffenberger v. Pavilion Restaurant Co.*, 352 Mich. 1, 88 N.W.2d 488 (1958), in support of this argument, but that case is inapposite because the Michigan Supreme Court expressly held that the pleaded claims sounded in agency and therefore were not controlled by the decisional law in cases involving corporate veil piercing or *alter ego* claims. *Id.* at 6, 88 N.W.2d at 491 ("Here, the pleadings speak not in terms of a parent and subsidiary corporate relationship involving a necessity for determining whether corporate identities shall be disregarded, but, rather, the averments are that an agency relationship exists between the corporations.").

In this case, there is no actual conflict of the laws between Michigan and Illinois on the elements of an *alter ego* claim or the adequacy of proof of the fraud or wrong element. Under Illinois law, the plaintiff must show that some wrong other than mere diminishment of the plaintiff's prospect of recovery would occur if the Court declines to pierce the corporate veil. The plaintiff must prove, for example, that "a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities," or that "an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful." *Sea-Land*, 941 F.2d at 524. But the showing accepted by the Sixth Circuit in *Servo Kinetics* was substantially identical to the examples cited in *Sea-Land*, because in *Servo Kinetics* the plaintiff proved that the parent corporation, after acquiring a previously independent subsidiary, then abused its position of control and used the subsidiary as a mere instrumentality in a deliberate scheme to cause the subsidiary to breach its contractual obligations, and the parent later sought to escape any liability for the subsidiary's breach that it had precipitated.

Moreover, as recent decisions of the Michigan appellate courts confirm, proof of the element of "fraud or wrong" is explicitly and necessarily distinct from the separate (and additional) required

-24-

showing that the plaintiff would suffer some "unjust loss."  In *Green v. Ziegelman*, 310 Mich. App. 486, 873 N.W.2d 794 (2015), the Michigan Court of Appeals noted that, in evaluating the "fraud or wrong" element, the Court "must determine whether the manner of use [of the entity operated as a 'mere instrumentality'] effected a fraud or wrong on the complainant."  *Id.* at 458, 873 N.W.2d at 807 (citing *Gledhill v. Fisher & Co.*, 272 Mich. 353, 358, 262 N.W. 371, 372 (1935)).  The court held that it would be sufficient for the plaintiff to show that a controlling entity "exercised [its] control over the [instrumental] entity in such a manner as to wrong the complainant."  *Ibid.* However, the court also cautioned that "establishing an entity for the purpose of avoiding personal responsibility is not by itself a wrong that would warrant disregarding the entity's separate existence."  *Id.* at 459, 873 N.W.2d at 807 (citing *Geldhill*, 272 Mich. at 359-61, 262 N.W.2d at 373).  And as the *Green* court further explained, the plaintiff *separately* must prove that "the wrong would cause the complainant to suffer an unjust loss."  *Ibid.* (citing *Geldhill*, 272 Mich. at 359, 262 N.W.2d at 373).  It is evident, therefore, that the Michigan courts regard proof of the "wrong" to be a separate and distinct showing from the mere proof that failure to pierce the corporate veil would cause the plaintiff to suffer an "unjust loss."  In order to prove the "fraud or wrong" element, the plaintiff must establish that a controlling entity engaged in deliberate wrongful conduct that either was designed to or actually did produce injury to obligees of the instrumental entity.  And the proof of "fraud or wrong" must comprise something other than a mere showing of an unjust loss to the plaintiff.

The choice-of-law rules favor application of Michigan law in all events. Under Michigan's choice-of-law rules concerning tort claims, there is a presumption that Michigan law applies unless there is a rational reason to displace it.  *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274,

286, 562 N.W.2d 466, 471 (1997); *see also Olmstead v. Anderson*, 428 Mich. 1, 24, 400 N.W.2d 292, 302 (1987). Although the *alter ego* claim is based in equity, it has elements of fraud and is akin to an action in tort for choice-of-law purposes. *See Muglia v. Kaumagraph Corp.*, 64 F.3d 663, 1995 WL 492933 *4 (6th Cir. 1995) (table) (noting that "it appears that a Michigan court sitting in diversity should apply Michigan law in this case regardless of whether the claim is a tort claim or a claim arising in equity") (citing Restatement (Second) Conflict of Laws §§ 6, 145). Courts sitting in Michigan "use another state's law [only] where the other state has a significant interest and Michigan has only a minimal interest in the matter." *Hall v. General Motors Corp.*, 229 Mich. App. 580, 585, 582 N.W.2d 866, 868 (1998). There is no suggestion that either of those conditions exist here. Therefore, the Court will apply the law of the forum — Michigan law — to decide the *alter ego* claim. *See Williams v. Toys R Us*, 138 F. App'x 798, 803 (6th Cir. 2005) ("Because there is no conflict of laws (indeed this is a false conflict situation), we therefore conclude that the district court did not err in applying Michigan state law in this case.").

### B. *Alter Ego* Theory

The Michigan Court of Appeals recently discussed the rationale undergirding *alter ego* claims:

> A corporation — or other artificial entity — is a legal fiction. It is an artificial being, invisible, intangible, and existing only in contemplation of law. Absent some abuse of corporate form, courts honor this fiction by indulging a presumption — often referred to as the corporate veil — that the entity is separate and distinct from its owner or owners. Courts will honor this presumption even when a single individual owns and operates the entity. However, the fiction of a distinct corporate entity separate from the stockholders is a convenience introduced in the law to subserve the ends of justice. When this fiction is invoked to subvert justice, it is ignored by the courts. As such, a court sitting in equity may look through the veil of corporate structure — that is, pierce the corporate veil — to avoid fraud or injustice.

-26-

*Green*, 310 Mich. App. at 450-51, 873 N.W.2d at 803-04 (citations, quotation marks, and alterations omitted); *see also Paul v. Univ. Motor Sales Co.*, 283 Mich. 587, 602, 278 N.W. 714, 720 (1938) ("[W]hen the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.").

The plaintiff alleges that Miller Chicago is the *alter ego* of Miller Detroit, and therefore the Illinois corporation should be held accountable for the claims of the Detroit limited liability company's creditors.  To prove that claim, the plaintiff must show by a preponderance of the evidence that "first, the corporate entity [was] a mere instrumentality of another; second, the corporate entity [was] used to commit a fraud or wrong; and third, there [was] an unjust loss or injury to the plaintiff." *In re RCS Engineered Products Co., Inc.*, 102 F.3d 223, 226 (6th Cir. 1996) (citing *Nogueras v. Maisel & Assoc. of Michigan*, 142 Mich. App. 71, 86, 369 N.W.2d 492, 498 (1985)).

Elaborating on these elements, the *Green* court explained that "the trial court must determine whether the evidence establishes that the owner operated the entity as his or her alter ego — that is, as a sham or mere agent or instrumentality of his or her will." *Green*, 310 Mich. App. at 458, 873 N.W.2d at 807.  It "then must determine whether the manner of use effected a fraud or wrong on the complainant." *Ibid.* (citing *Gledhill*, 272 Mich. at 358, 262 N.W.2d at 372).  "In considering this element, it is not necessary to prove that the owner caused the entity to directly harm the complainant; it is sufficient that the owner exercised his or her control over the entity in such a manner as to wrong the complainant." *Ibid.*  "But it bears repeating that establishing an entity for the purpose of avoiding personal responsibility is not by itself a wrong that would warrant disregarding the entity's separate existence." *Id.* at 458, 873 N.W.2d at 807.  (citing *Gledhill*, 272

-27-

Mich. at 359-61, 262 N.W.2d at 373). "Finally, the trial court must determine whether the wrong would cause the complainant to suffer an unjust loss." *Ibid.* (citing *Geldhill*, 272 Mich. at 359, 262 N.W.2d at 373).

To show that one entity is the "mere instrumentality" of another entity, courts look to these factors:

> (1) whether the corporation is undercapitalized, (2) whether separate books are kept, (3) whether there are separate finances for the corporation, (4) whether the corporation is used for fraud or illegality, (5) whether corporate formalities have been followed, and (6) whether the corporation is a sham."

*Glenn v. TPI Petroleum, Inc.*, 305 Mich. App. 698, 716, 854 N.W.2d 509, 520 (2014).

In this case, Miller Chicago certainly was not undercapitalized. And Miller Detroit enjoyed its own revenue stream from the parking lot entities for which it performed administrative services. It paid its bills as they came due, with the exception of distributing proceeds to other Miller-family-owned entities. It bears observing that James Miller was able to operate a new business profitably from the Miller Detroit contracts he purchased from the bankruptcy trustee.

As noted above, the companies kept separate books and observed adequate corporate formalities. Both businesses had separate and substantial historical roots, and neither was a sham.

The plaintiff argues that the entities were operated to perpetrate tax fraud, pointing to the conversion of Bruce Miller's debt to Miller Chicago into wages. The plaintiff argues that Bruce Miller performed no "work" for Miller Chicago, and therefore treating his loans as wages — so that Miller Chicago could deduct them as expenses — was a fraudulent practice. But there is no dispute that Bruce Miller paid income tax to the appropriate units of government for that "income." And there is no requirement that a person perform any specific type of service before compensation can be characterized as such. In fact, the Supreme Court has noted that "an employer, if he chooses, may

-28-

hire a man to do nothing, or to do nothing but wait for something to happen." *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944). Treating Bruce Miller's loans as income to him did not amount to fraud. There is no other evidence that Miller Chicago was operated in a way that perpetrated a fraud on its creditors, the creditors of Miller Detroit, or anyone else.

Finally, the evidence does not establish that the creditors of Miller Detroit suffered an "unjust loss" at the hands of Miller Chicago. The creditors — more particularly, the judgment creditors — sought to recover from Miller Detroit and Bruce Miller, and they complain that neither has assets to satisfy their judgments. But there is very little evidence of money moving *from* Detroit *to* Chicago. According to the record, which in large part is not disputed, for the most part all of the greater cash flows went the other way, from Chicago to Detroit. Moreover, the fact that money had to be *moved* in this manner — that is, through loans, "wages" to Bruce Miller, and exaggerated payments for administrative services — regardless which direction particular transfers went, underscores the fact that the assets of these entities were separate, not commingled, and that something had to be done to accomplish a transfer of funds between them.

There is one set of transfers that deserves scrutiny: the $510,000 in payments on the purported promissory notes issued by Detroit to Chicago made from September 2004 through September 2009 ($8,500 per month x 60 months). It is undisputed that the Chicago shareholders at first went along with the plan to "gift" money to an insistent Bruce Miller by shuttling cash from Chicago to Detroit, whenever it was needed to replenish Detroit's funds due to the heavy partner draws that Bruce Miller was taking. The promissory note and resulting payments constitute an attempt by the Chicago shareholders — especially James Miller — to cushion the impact of their generosity. Those payments, of course, rendered unavailable to Miller Detroit creditors a half-

-29-

million dollars of then-current operating profits over the course of five years, after the Chicago shareholders came to regret their largesse.  That Miller Chicago transferred cash to Miller Detroit and then sought to recover it, however, does not prove that other creditors thereby suffered an "unjust" loss.

The record demonstrates that the Miller Chicago shareholders knew their cash transfers to Miller Detroit were for the benefit of Bruce Miller.  But instead of assuming the form of "gifts" to Bruce Miller, they were treated as "loans" to Miller Detroit.  Bruce enjoyed the measure of those loans, but until the judgments were entered, only Miller Detroit's family creditors paid the price of them.  And it is abundantly clear that at the end of the day, the great net cash flow went straight into Bruce Miller's pocket.  If Miller Chicago had given cash to Miller Detroit and Detroit had paid it back, and nothing more had come of it, then the result would have been a wash, minus any transaction costs.  The reason that Detroit wound up penniless was that Bruce Miller took everything it had — and more — for himself.  Miller Chicago's support allowed the bloodletting to continue longer than it otherwise could have.  But that does not amount to evidence of fraud, nor does it show that Miller Chicago and Miller Detroit were not "separate and distinct" entities, or that Miller Detroit's creditors thereby suffered an "unjust" loss.  The author of the damage they suffered was Bruce Miller, and the plaintiff's final recourse must run to him (or to his bankruptcy estate), not to Miller Chicago or the principals and investors of that entity.

The plaintiff has not sustained her burden of proving the elements of her *alter ego* claim. Therefore, the Court will dismiss count VI of the amended complaint.

### C.  Substantive Consolidation

The plaintiff also seeks substantive consolidation of the assets and liabilities of Miller Chicago with those of Miller Detroit.  Substantive consolidation "has been described as a process that '"treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor."'" *In re Cyberco Holdings, Inc.*, 734 F.3d 432, 438 (6th Cir. 2013) (quoting *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005)).

"Substantive consolidation is an extreme remedy that is used only where there are no other adequate remedies, 'particularly where the entity sought to be consolidated is not itself already a debtor in bankruptcy.'"  *In re Howland*, 518 B.R. 408, 412 (Bankr. E.D. Ky. 2014) (quoting *In re Am. Camshaft Specialties, Inc.*, 410 B.R. 765, 787 (Bankr. E.D. Mich. 2009)).  The federal courts have regarded many and varied factors as pertinent to the decision whether to order substantive consolidation, but the Third Circuit has endorsed a more open-ended equitable standard, avoiding any "checklist" of specific factors.  After surveying the decisions ordering substantive consolidation, the Third Circuit concluded, based on its assessment of the underlying equitable principles that motivate courts to apply the remedy, that "what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."  *In re Owens Corning*, 419 F.3d at 211.  The Sixth Circuit has not endorsed any specific set of factors to be considered in substantive

-31-

consolidation cases, but the district courts of this circuit have tended to adopt the *Owens Corning* formulation, since that decision is the one most recently cited with approval by our court of appeals. *E.g.*, *In re Howland*, 518 B.R. 408, 412 n.2 (Bankr. E.D. Ky. 2014); *In re Am. Camshaft Specialties, Inc.*, 410 B.R. at 787.

It does not appear, and the plaintiff does not argue, that the second basis provides grounds for substantive consolidation. There has been no post-petition "scrambling" of assets and liabilities of Miller Detroit and Miller Chicago. As a practical matter, the proofs that would tend to establish the first basis — a disregard of corporate "separateness," reliance by creditors on an outward appearance of a single entity — mirror in large measure those that would support an *alter ego* claim. *See In re Am. Camshaft Specialties, Inc.*, 410 B.R. at 785 (noting that "the courts have discussed [*alter ego* and substantive consolidation claims] together and have noted certain similarities of these causes of action"). And the result of prevailing on each such claim is the same: like the *alter ego* claim, the substantive consolidation "doctrine authorizes a court to look past the limited liability that is a hallmark of corporate law in the United States and the legal separateness of an entity that it provides for." *Id.* at 786. Factors courts consider in assessing a demand for substantive consolidation include:

> (1) The presence or absence of consolidated financial statements; (2) The unity of interests and ownership between various corporate entities; (3) The existence of parent and intercorporate guarantees on loans; (4) The degree of difficulty in segregating and ascertaining individual assets and liabilities; (5) The existence of transfers of assets without formal observance of corporate formalities; (6) The commingling of assets and business functions; [and] (7) The profitability of consolidation at a single physical location.

*In re Bli Farms*, 312 B.R. 606, 621 (E.D. Mich. 2004) (citing *Holywell Corp. v. Bank of New York*, 59 B.R. 340, 347 (S.D. Fla. 1986)).

-32-

As discussed in the previous section, the balance of those factors do not support the proposition that Miller Chicago and Miller Detroit were operated as a single legal entity, or that creditors of Miller Detroit had any legitimate reason to believe that they were dealing with Miller Chicago and could look to its assets to satisfy their claims. Therefore, the Court will dismiss count V of the amended complaint.

### D. Disgorgement

The plaintiff argued in her post-trial brief that she is entitled to disgorgement of the distributions made to the shareholders of Miller Chicago upon the dissolution of that corporation. She contends, correctly, that a bankruptcy trustee may nullify voidable transfers for the benefit of all the estate's creditors. *See* 11 U.S.C. §§ 544, 550. However, the plaintiff bases her argument entirely on the success of her claims in Counts V and VI of the amended complaint, asserting that for avoidance purposes, a transfer made by an *alter ego* of a bankruptcy debtor is treated as the transfer of the debtor, citing *In re Brentwood Golf Club, LLC*, 329 B.R. 802, 811 (Bankr. E.D. Mich. 2005).

Because the Court has determined that Miller Chicago is not the *alter ego* of Miller Detroit, and that the plaintiff is not entitled to substantive consolidation, there is no basis on the proofs presented to order disgorgement of any distributions made by or on behalf of Miller Chicago to its shareholders or creditors. Therefore, the Court will dismiss Count IV of the amended complaint.

### E. Accounting

The final pretrial order directed the parties to submit the claim for an accounting as stated in Count IX of the amended complaint to a trial before the Court without a jury, as that claim sounds

in equity and is not amenable to a jury trial.  The plaintiff refused to proceed on that count at trial, however, suggesting that the claim is dependent on other counts in the complaint that were reserved for a jury trial.  However, under Michigan law, a demand for an accounting is a free standing equitable cause of action, with elements that must be alleged and proven.  *See Boyd v. Nelson Credit Centers, Inc.*, 132 Mich. App. 774, 779-80, 348 N.W.2d 25, 27 (1984).  As no proofs were submitted on that count, it will be dismissed.

### III.  CONCLUSION

For the reasons stated, the Court will dismiss Counts IV, V, VI, and IX of the amended complaint with prejudice.  The Court will not enter final judgment on those counts, however, because there is a substantial relationship of those counts with the remaining claims that have been reserved for a jury trial.  Depending on the success of the plaintiff on those claims, the need for review of this decision might be mooted by further developments in this Court.  Therefore, the Court believes that entering a final judgment under Federal Rule of Civil Procedure 54(b) would not be prudent at this time.  *See* Fed. R. Civ. P. 54(b); *Akers v. Alvey*, 338 F.3d 491, 495 (6th Cir. 2003) (citing *Corrosioneering v. Thyssen Envtl. Sys.*, 807 F.2d 1279, 1282 (6th Cir. 1986)).

An appropriate order will follow.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  May 12, 2016

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 12, 2016.

s/Susan Pinkowski
SUSAN PINKOWSKI